UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
THOMAS DONOHUE,                            :
                                       :
                Plaintiff,            :
                                         :
                                         :          **MEMORANDUM**
          -against-             :          **AND ORDER**
                                         :
                                         :          2:15-CV-636 (PK)
DR. VINCENT MANETTI, *by his employer Armor*    :
*Correctional Health Services*, DENISE BRADY *by her*    :
*employer Armor Correctional Health Services*,         :
                                         :
                Defendants.        :
                                         :
---------------------------------------------------------------- x

**Peggy Kuo, United States Magistrate Judge:**

Thomas Donohue ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983, alleging that he was deprived of his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution by Dr. Vincent Manetti, Nurse Denise Brady, and their employer  Armor Correctional Health Services (collectively, "Defendants").  (Compl. at 1, Dkt. 1.)

Before the Court is Defendants' Motion for Summary Judgment ("Motion").  (Dkt. 109.)  For the reasons set forth below, the Motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

Unless otherwise stated, the following facts are taken from Defendants' Statement of Undisputed Facts ("Defs. 56.1," Dkt. 109-1), Plaintiff's Statement of Disputed Facts ("Pl. 56.1 Opp.," Dkt. 109-12 at 1–31[1]), Plaintiff's Counterstatement of Material Facts ("Pl. 56.1," 109-12 at 32–45), and exhibits attached to the Motion (*see* Declaration of Dale McLaren ("McLaren Decl."), Dkt. 109) and Plaintiff's opposition to the Motion (*see* Declaration of Frederick K. Brewington ("Brewington

---

[1] Beginning with number 7, Plaintiff has misnumbered his responses to Defendants' statements.  The Court uses the Defendants' numbering system when citing to Plaintiff's responses in his Statement of Disputed Facts.

Decl."), Dkt. 109-13[2]).  Unless otherwise noted, the facts are agreed upon by the parties.

## I.     The Parties

Armor Correctional Health Services ("Armor") provides medical services to inmates at Nassau County Correctional Center ("NCCC") pursuant to a contract with Nassau County.  (Pl. 56.1 ¶¶ 1–2.) Dr. Vincent Manetti worked as a psychiatrist for Armor from June 2011 to October 2016.  (Defs. 56.1 ¶ 25; Pl. 56.1 Opp. ¶ 25.)  Denise Brady began working for Armor in 2011 as a Licensed Practical Nurse ("LPN") and became a Registered Nurse ("RN") in 2015.  (Defs. 56.1 ¶ 50; Pl. 56.1 Opp. ¶ 50.)

Plaintiff was incarcerated at NCCC from September 19, 2014 to June 18, 2015.  (Defs. 56.1 ¶ 1, 4, 13; Pl. 56.1 ¶¶ 1, 4, 13; Memorandum of Law in Support of the Armor Defendants' Motion for Summary Judgment ("Def. Mem.") at 3, Dkt. 109-11; Plaintiff Deposition Transcript ("Pl. Tr.") 13:24, Ex. D. to McLaren Decl., Dkt. 109-4.)

## II.    Plaintiff's Arrest and Admission to Nassau County Correctional Center

After his arrest on September 18, 2014, Plaintiff underwent a medical evaluation at Nassau University Medical Center ("NUMC"), where he complained of body aches, tremors, moderate pain, nausea, restlessness, and anxiety; he also indicated that he had a history of alcohol and heroin dependence and had ingested beer and heroin shortly before his arrest.  (NUMC Emergency Physician Record ("NUMC Record"), Ex. B to McLaren Decl., Dkt. 108-1 at 2.)  The NUMC Record states that Plaintiff is allergic to non-steroidal anti-inflammatory drugs ("NSAIDs").  (*Id.*)  Plaintiff was diagnosed with opioid abuse and given a treatment plan of methadone.  (NUMC Patient Discharge Instructions, Ex. B to McLaren Decl., Dkt. 108-1 at 1.)

---

[2] Because of inconsistencies in page numbering of exhibits attached to the Brewington Declaration, the Court refers to the ECF pagination.

The next day, when Plaintiff was transferred to NCCC, Armor performed its own assessment of Plaintiff's physical and mental health.[3] (Defs. 56.1 ¶¶ 5, 8; Pl. 56.1 Opp. ¶¶ 5, 8.) Armor medical records dated September 19, 2014 indicate that Plaintiff has a history of depression and anxiety, for which he was hospitalized in 1988 and 2011, that he has taken the psychiatric medications Klonopin and nortriptyline in the past, and that he was not suicidal. ("Armor Health Assessment," Ex. C to McLaren Decl., Dkt. 108-2 at 6–7; "Armor Mental Health Screening," Ex. C to McLaren Decl., Dkt. 108-2 at 8.) The records also report that Plaintiff had neck surgery in 2007 and that he is allergic to NSAIDs. (Armor Health Assessment at 6.) Plaintiff's complaints at that time were described as "anxiety, diarrhea, chills, restlessness, [and] achiness," and a tremor was noted. (*Id.*) Plaintiff was assessed with opioid dependence as a chronic health problem, and the screener noted that there was "[e]vidence of mental health condition" but that Plaintiff "presents as stable." (*Id.* at 8; *see* Defs. 56.1 ¶ 8; Pl. 56.1 Opp. ¶ 8.)

Plaintiff was admitted to the medical floor at NCCC and put in a psychiatric cell. (Defs. 56.1 ¶ 10; Pl. 56.1 Opp. ¶ 10.) He was put on a 6-day Valium taper and prescribed Thiamine to prevent symptoms of alcohol withdrawal. ("Mendelsohn Report" at 5, Ex. D to Brewington Decl., Dkt. 109-18; Ex C-3 to Brewington Decl., Dkt. 108-5 at 17.)

### III.  Mental Health Treatment

Despite the initial assessment that Plaintiff was not suicidal, at some point, he was placed on suicidal precautions, resulting in his being seen by Dr. Manetti on September 23, 2014. (Defs. 56.1 ¶ 28; Pl. 56.1 Opp. ¶ 28; Ex. C to McLaren Decl., Dkt. 108-2 at 18.) During the visit, Plaintiff told Dr. Manetti, "I feel pain and I don't want to live." (*Id.* at 18; *see* Defs. 56.1 ¶ 32; Pl. 56.1 Opp. ¶ 32.) Dr.

---

[3] Plaintiff was given an "Initial Mental Health Evaluation" on September 20, 2014, which has been submitted to the Court only as an exhibit to the report of Defendant's expert Dr. Mathis. (*See* "Mathis Report" at 96 (ECF pagination), Dkt. 117.)

Manetti found Plaintiff "behaviorally controlled, mood is euthymic"—that is, he was neither depressed nor euphoric—and noted that he had suicidal ideations. (Defs. 56.1 ¶ 33–34; Pl. 56.1 Opp. ¶¶ 33–34; Ex. C to McLaren Decl., Dkt. 108-2 at 18.) Dr. Manetti ordered that Plaintiff remain under constant supervision, which meant that he would be seen by a mental health professional daily. (Defs. 56.1 ¶¶ 36–38; Pl. 56.1 Opp. ¶¶ 36–38.)

According to his September 23, 2014 note, Dr. Manetti did not personally prescribe any medication to Plaintiff. (Defs. 56.1 ¶ 37; Pl. 56.1 Opp. ¶ 37.) Plaintiff had been previously incarcerated at Fishkill Correctional Facility ("Fishkill"), where he received Ultram[4] and Neurontin[5] twice a day for pain and nortriptyline or Amitriptyline for his mental health. (Pl. Tr. 55:19–56:10, 57:2–58:3.) When he was released from Fishkill in July 2014, Plaintiff was given prescriptions for Neurontin, Ultram, and Nortryptylene. (*Id.* 79:8–80:13.) Plaintiff alleges that, despite this, Dr. Manetti told him, "Things are different now . . . we don't hand out medication like that." (Pl. Tr. 103:3–6.) Dr. Manetti denies making that statement. (Manetti Tr. 131:20–132:19.)

At Dr. Manetti's request, Plaintiff authorized Fishkill to release his initial psychiatric evaluation and verify his medications. (*Id.* 52:4–8; "Sept. 23 Release of Information," Dkt. 108-2 at 9; *see* Defs. 56.1 ¶ 29; Pl. 56.1 Opp. ¶ 29.)

The same evening he saw Dr. Manetti, Plaintiff experienced "seizure-like activities" and was taken to NUMC. (Pl. 56.1 ¶¶ 8, 64.) After a CT scan came back negative, NUMC gave him medication for seizures and recommended that he follow up with neurology. (*Id.* ¶ 9.)

Plaintiff returned to NCCC and on September 24 was seen by Dr. Manetti's supervisor, Dr.

---

[4] Tramadol is a generic equivalent to Ultram. *See, e.g., Alston v. Caraco Pharm., Inc.,* 670 F. Supp. 2d 279, 281 (S.D.N.Y. 2009).

[5] Gabapentin is the generic name for Neurontin. *See, e.g., In re Neurontin Mktg., Sales Pracs., & Prod. Liab. Litig.,* 612 F. Supp. 2d 116, 122 n.5 (D. Mass. 2009).

Ronald Longo.  ("Longo Sept. 24 Note," Ex. C-1 to Brewington Decl., Dkt. 108-3 at 12.)  Dr. Longo noted that Plaintiff was no longer suicidal and that he complained of neck pain.  (*Id.*; *see* Herrington Report at 3.)

On September 26, 2014, Plaintiff signed a release authorizing CVS Pharmacy to verify his current medication.  ("CVS Release," Ex. C to McLaren Decl., Dkt. 108-2 at 10.)  According to Plaintiff's expert Dr. Nathaniel Mendelsohn, a call to CVS on that date "confirms that [Plaintiff] last picked up Nortriptyline on 8/14/14." (Mendelsohn Report at 6; *see* Defs. 56.1 ¶ 11; Pl. 56.1 Opp. ¶ 11.)

Plaintiff went to NUMC again on September 29, 2014 and was seen for seizures.  He was given seizure medication, discharged, and directed to follow up with neurology.  (Ex. C-3 to Brewington Decl., Dkt. 108-5 at 43.)

On October 3, 2014, at his second meeting with Plaintiff, Dr. Manetti noted that Plaintiff was hostile, overly dramatic, and angry, and that Plaintiff demanded benzodiazepines, which are typically for anxiety, stating, "I want meds because I'm in jail."  ("Manetti Oct. 3 Note," Ex. C to McLaren Decl. at 17; Defs. 56.1 ¶¶ 39, 40, 42; Pl. 56.1 Opp. ¶¶ 39, 40, 42.)  Plaintiff acknowledges that this statement appears in the medical record but denies having made it.  (Pl. 56.1 Opp. ¶ 42.)  Dr. Manetti indicated that Plaintiff did not exhibit signs of depression.  (Defs. 56.1 ¶ 43; Pl. 56.1 Opp. ¶ 43.[6])

Writing in his note, "no acute need for meds" (Manetti Tr. 67:14–15), Dr. Manetti did not prescribe Plaintiff any medication because he did not know what, if any, medications Plaintiff was previously taking; was concerned that Plaintiff might be malingering; and believed that it was inadvisable to prescribe controlled substances to someone with a history of polysubstance abuse.

---

[6] Plaintiff disputes these statements, but his disagreement is not responsive.  (*See* Pl. 56.1 ¶ 44.)

(Defs. 56.1 ¶¶ 40, 44, 45[7]; Manetti Tr. 56:2–5, 71:7–12.)  Dr. Manetti also re-faxed the release for Plaintiff's records to Fishkill because he had not gotten a response to the initial request.  (Manetti Tr. 73:19–23.)  Dr. Manetti testified at his deposition that he never learned which medications Plaintiffs was previously taking.  (*Id.* 56:17–25; *see* Def. 56.1 ¶ 41; Pl. 56.1 Opp. ¶ 41.)

On October 12, 2014, Plaintiff was again seen at NUMC for seizures.  (*See* Ex. C-3 to Brewington Decl. at 27.)  He was given seizure medication and Neurontin and told to follow up with neurology.  (*See id.* at 27, 32.)

A Medication Administration Record indicates that on October 15, 2014, "Dr. Marcos" prescribed nortriptyline to Plaintiff, to be taken daily for thirty days.  (Ex. C-1 to Brewington Decl., Dkt. 108-3 at 5.)  Plaintiff does not dispute this in his Counterstatement of Facts, expert report, or deposition testimony.  (*See* Pl. 56.1 ¶ 69 ("On 10/15/14, nortriptyline 25 mg is started by Dr. Marcos, who is not a psychiatrist."); Mendelsohn Report at 6 (same)).  He also testified that he began receiving nortriptyline shortly after he arrived at NCCC.[8]  (*See* Pl. Tr. 80:7–24.)

Nevertheless, Plaintiff claimed he "was never given Nortriptyline" (Pl. 56.1 Opp. ¶ 11) and testified that during his entire stay at NCCC, he "received no mental health medication."  (Pl. Tr. 87:3–15.)

The prescription for nortriptyline was discontinued on November 11, 2014 and not renewed.  (Mendelsohn Report at 7; Ex. C-1 to Brewington Decl. at 6; Ex. C-5 to Brewington Decl. at 26.)

---

[7] Plaintiff disputes these statements, but his disagreement is not responsive.  (*See* Pl. 56.1 ¶¶ 41, 45, 46.)

[8] Plaintiff's deposition testimony was slightly inconsistent as to when he began receiving nortriptyline. He testified that he began receiving the medication within a week after he arrived at NCCC:  "Q. After that phone call [by Dr. Marcos to CVS], what medications did Armor prescribe you for your pain? A. They gave me the Neurontin and she ordered me Ultram and Nortryptylene [sic]." Q. That's for the mental health? A. Right. Q. The Nortryptylene, is that for anxiety or depression or both?  A.  A lot of them are like combo.  Q.  How soon after you arrived at the facility in 2014 did they start giving you the Neurontin and Ultram?  A. I would say within a week approximately.  Q.  Was it the same for the mental health medication, the Nortryptylene?  A. Yes."  (Pl. Tr. 80:7–24.)

On November 30, 2014, Plaintiff filed a grievance, stating that he had been on mental health medication for depression and anxiety since the 1980s and had not received psychiatric medication at NCCC. ("Nov. 30 Grievance," Compl. at 18.) On December 10, 2014, the Grievance Coordinator denied Plaintiff's grievance. (*Id.*) On December 11, 2014, Plaintiff appealed the Grievance Coordinator's decision, which the Chief Administrative Officer denied on December 23, 2014. (*Id.*) On December 31, 2014, Plaintiff appealed the Chief Administrative Officer's decision to the Citizen's Policy and Complaint Review Counsel at the Commission of Correction. (*Id.* at 19.) Plaintiff does not know if he ever received a final decision on the appeal. (Pl. Tr. 99:16–100:3.)

Until his release from NCCC on June 18, 2015, Plaintiff was seen by various social workers on mental health rounds who documented his mental state, which indicated that Plaintiff was often depressed, was asking for medication, or was asking to see Dr. Manetti.[9]

Plaintiff claims that as a result of not being given psychiatric medication, he "suffered extensive mental anguish and suffering during his incarceration." (Pl. 56.1 ¶ 85.) He states that he attempted suicide in his cell in December 2014 (*id.* ¶ 82), although the incident was not documented. Plaintiff experienced panic attacks, was unable eat or sleep, felt like he was unable to breathe, and endured "crazy depression." (*Id.* ¶ 81.)

---

[9] For example:
- On October 10, 2014, Plaintiff stated, "I need meds, I'm stressed." (Ex. C-1 to Brewington Decl. at 17.)
- On October 17, 2014, Plaintiff stated that he was okay but wanted depression medication. (*Id.* at 20.)
- On October 24, 2014, Plaintiff stated, "I'm depressed still." (*Id.* at 21.)
- On October 31, 2014, Plaintiff stated "I'm in pain and my whole life has been a mess." (*Id.* at 14.)
- On November 7, 2014, Plaintiff stated "I'm still not getting medication." (*Id.* at 32.)
- On December 3, 2014, Plaintiff stated, "I'm depressed and need meds." (*Id.* at 34.)
- On January 14, 2015, Plaintiff stated, "I'm feeling better, still anxious." (Ex C-2 to Brewington Decl. at 8.)
- On February 4, 2015, Plaintiff stated, "still depressed and making it work." (*Id.* at 17.)
- On March 6, 2015, Plaintiff stated, "I'm okay waiting for court." (*Id.* at 17.)

### IV.    Pain Management Treatment

Plaintiff suffered from chronic pain in his lower back, neck, shoulders, and arms.  (Defs. 56.1 ¶ 19; Pl. 56.1 Opp. ¶ 19.)  On September 26, 2014, Plaintiff was prescribed Neurontin and Bengay for pain.  (Ex. C-5 to Brewington Decl. at 35; Ex. C-4 to Brewington Decl. at 12.)  On November 3, 2014, the pain medication Ultram was also ordered for Plaintiff.  (*Id.* at 9.)

On December 9, 2014, Neurontin was discontinued (Ex. C-1 to Brewington Decl. at 2), but records indicate that Plaintiff was taking it again by December 16, 2014 (Ex. C-4 to Brewington Decl. at 21).  Plaintiff's prescription for Neurontin was discontinued and re-ordered at various times during his incarceration.  (*See, e.g.*, Ex. C to Brewington Decl., Dkt. 108-2 at 15 (Neurontin discontinued on Feb. 6, 2015); Ex. C-1 to Brewington Decl. at 2 (Neurontin discontinued on Dec. 9, 2014).)

On December 17, 2014, Plaintiff's Ultram prescription was discontinued.  (Herrington Report at 4; Deposition Transcript of Denise Brady ("Brady Tr.") 93:17–94:11, Ex. F to McLaren Decl., Dkt. 109-6; Ex. C-1 to Brewington Decl. at 2.)  The corresponding order sheet states "Brady noted" next to the discontinuation order.  (*See* Ex. C-5 to Brewington Decl. at 29.)

Plaintiff testified that Ms. Brady told him that she was discontinuing his medication, walked away from him with a smirk, and came back and gave him ibuprofen—an NSAID to which he is allergic—instead of his prescribed Ultram medication.  (Pl. Tr. 91:19–94:15.)  Ms. Brady denies discontinuing Plaintiff's medication and states that as an LPN, she did not have the authority to do so.  (Defs. 56.1 ¶¶ 55, 56; Pl. 56.1 Opp. ¶¶ 55, 56.)  Plaintiff does not dispute that, as an LPN, Ms. Brady was required to get permission before giving controlled substances to inmates.  (Pl. 56.1 Opp. ¶ 58.)  Her duties included filling medication carts, preparing medication administration records, distributing medication to inmates, and picking up orders from doctors.  (Defs. 56.1 ¶ 50; Pl. 56.1 Opp. ¶ 50.)  She was expected to know what medications inmates were allergic to.  (Defs. 56.1 ¶ 52; Pl. 56.1 Opp. ¶ 52.)

Plaintiff testified that after he took the ibuprofen Ms. Brady administered, "I had an episode, an allergic reaction. My heart was racing a million miles a minute, my throat got so tight and I couldn't breathe; I had an episode where I fainted out, man, I don't know what happened." (Pl. Tr. 94:23–95:7.) Plaintiff testified that the next day, he confronted Ms. Brady, "angrily cursing and demand[ing] what she ordered [him]." (*Id.* 95:15–18.) Ms. Brady replied, "Ibuprofen 800 milligrams," and Plaintiff responded: "What, are you stupid, I am allergic to it, it is on the bottom of the sheet." (*Id.* 95:19–21.) Plaintiff testified that Ms. Brady then said, "Oh, oh," and left. (*Id.* 95:22.)

After this incident, no Armor employee gave Plaintiff ibuprofen again. (Pl. Tr. 96:2–9.)

In the Complaint, Plaintiff describes the incident differently. He alleges that when he confronted Ms. Brady the day after his allergic reaction, she responded, "I was hoping you would have died." (Pl. 56.1 ¶ 66; Compl. ¶ 33; *id.* at 16 (attaching copy of Plaintiff's grievance form dated Dec. 17, 2014).)

Ms. Brady denies having made any of these statements or giving Plaintiff an NSAID. (Defs. 56.1 ¶ 59.)

Plaintiff filed a grievance on December 17, 2014, stating that while he was ordered Ultram for pain, he was administered instead medication that he was allergic to. (Compl. at 20–21, 16–17.) He requested that he be given medications "ordered for [him] by specialists" and sought "an order of protection" against Ms. Brady. (*Id.* at 20.) Plaintiff states that his grievance was "accepted" and that Ms. Brady was not allowed to interact with him anymore. (*Id.*; Pl. Tr. 101:9–13.)

Ultram was re-ordered for Plaintiff on December 30, 2014. (Ex. C-5 to Brewington Decl. at 29.) There are gaps in Plaintiff's receipt of Ultram on various dates in November and December 2014 and between February 1, 2015, and February 5, 2015. (Pl. 56.1 ¶ 44; Herrington Report at 7–8.) On March 23, 2015, Plaintiff's Ultram dosage was reduced (Herrington Report at 4; Ex. C-4 to Brewington Decl. at 3), and, on April 10, 2015, it was restored (*id.* at 5).

Throughout Plaintiff's incarceration at NCCC, he wrote approximately 78 sick call notes "complaining of untreated pain, lack of renewal of pain medication, failure of doctors to treat and the discontinuing of medication, among other complaints." (Pl. 56.1 ¶ 11; *see* Exs. J-1 & J-2 to Brewington Decl., Dkt. 108-9 & 108-10.)[10]

Plaintiff also wrote sick call requests asking that medication be renewed. For example, on February 4, 2015, Plaintiff wrote, "My pain med (Tramadol) ran out on 1-29-15." (Ex. J-1 to Brewington Decl. at 32.) Several of Plaintiff's sick call requests state that his pain medication will run out in the future and that he will need it renewed. (*See, e.g.*, Ex. J-1 to Brewington Decl. at 27, 42-44, 46; Ex. J-2 to Brewington Decl. at 7.) Many of Plaintiff's medications were also prescribed for short durations "as needed." (Pl. 56.1 ¶ 46.)

## V. Plaintiff's Treatment After Leaving NCCC

In June 2015, Plaintiff was transferred to Franklin Correctional Facility ("Franklin"). (Defs. 56.1 ¶ 13; Pl. 56.1 Opp. ¶ 13.) While at Franklin, Plaintiff was prescribed Ultram and Neurontin and later Percocet and/or Oxycodone for pain management, as well as Wellbutrin and Zoloft for his mental health. (Defs. 56.1 ¶ 14; Pl. 56.1 Opp. ¶ 14.)

---

[10] Plaintiff's sick call requests complaining of pain include, *inter alia*:
- On September 27, 2014, Plaintiff wrote, "massive chronic pain in cervical spine" (Ex J-1 to Brewington Decl. at 3, Dkt. 108-9).
- On October 7, 2014, he wrote, "I do not sleep, or rest at all due to serious neck trauma." (*Id.* at 6.)
- On October 21, 2014, Plaintiff wrote that he had "crushing pain in base of neck." (*Id.* at 8.)
- On October 23, 2014, he wrote, "Loss of about 50% or more of left arm strength (numb and in pain) and about 30% of left leg since seizure." (*Id.* at 9.)
- On November 20, 2014, he wrote, "severe pain and numbness in both arms and left leg!" (*Id.* at 12.)
- On November 22, 2014, Plaintiff wrote, "I have been experiencing massive pinched nerve migraine headaches every day along with problems with lft. side of my body!" (*Id.* at 13.)
- On December 4, 2014, he wrote, "I am in extreme amounts of pain all day and night. . . ." (*Id.* at 17.)
- On December 12, 2014, Plaintiff wrote, "[E]xcruciating migraine headaches and severe neck pain and lower back and leg pains." (*Id.* at 20.)
- On February 3, 2015, he wrote, "I am in excruciating pain in my cervical spine and lumbar spine from bulged discs w/ pinched nerves." (*Id.* at 31.)
- On March 20, 2015, Plaintiff wrote, "Extreme pain in lower back. . . ." (*Id.* at 43.)

Plaintiff was later transferred to Mid-State Correctional Facility ("Mid-State") and then to Marcy Correctional Facility ("Marcy").  (Defs. 56.1 ¶¶ 15, 18; Pl. 56.1 Opp. ¶¶ 15, 18.)  He was not given pain medication at either facility, pursuant to a newly instituted New York State policy that disallowed giving pain medication to inmates.  (Defs. 56.1 ¶¶ 15, 18; Pl. 56.1 Opp. ¶¶ 15, 18.)  Despite his pain levels being the same at these facilities as they were at NCC and Franklin, Plaintiff was "able to survive" without pain medication.  (Pl. Tr. 66:4–16; *see* Defs. 56.1 ¶ 20; Pl. 56.1 Opp. ¶ 20.)

## VII.    The Parties' Expert Witness Reports

### A.  *Expert Reports Regarding Plaintiff's Mental Health Treatment*

Dr. Nathaniel Mendelsohn, a psychiatrist, produced a report on behalf of Plaintiff on September 17, 2021.  (Mendelsohn Report.)   Based on a review of the relevant records and a psychiatric evaluation of Plaintiff, he concluded that Dr. Manetti was "grossly negligent" in his psychiatric treatment of Plaintiff.  (Defs. 56.1 ¶ 63; Pl. 56.1 Opp. ¶ 63.)  Dr. Mendelsohn stated that because the anxiety medication nortriptyline was not a controlled substance, Plaintiff's substance dependence history did not preclude Dr. Manetti from prescribing it for him.  (Mendelsohn Report at 12.)  He also concluded that Dr. Manetti did not conduct the necessary diagnostic tests to support the conclusion that Plaintiff might have been malingering  (*id.* at 11–12), and that Dr. Manetti deviated from the standard of care in failing "to gather as much information as possible on the psychiatric care and treatment rendered to [Plaintiff] prior to his arrival at Nassau County," given that Plaintiff provided "a history that he had prior psychiatric treatment and had been placed on medication" (*id.* at 11).  Dr. Mendelsohn concluded that, as a result of Dr. Manetti's deviation from "standard, customary and ordinary psychiatric treatment," Plaintiff suffered "extensive mental anguish and suffering."  (*Id.* at 13.)

Defendants' expert Dr. Robert Goldstein, a psychiatrist and professor of psychiatry, produced a report on November 17, 2021.  ("Goldstein Report," Ex. I to McLaren Decl., Dkt. 109-9;  Defs.

56.1 ¶ 64.)  Based on his review of the relevant records, Dr. Goldstein concluded that Dr. Manetti and

Armor's psychiatric care and treatment of Plaintiff "met the standard of care."  (Defs. 56.1 ¶ 64;

Goldstein Report at 14.)

### B.  Expert Reports Regarding Plaintiff's Pain Management Treatment

Dr. Ryan Herrington produced a report on behalf of Plaintiff on April 26, 2021.  ("Herrington

Report," Ex. G to Brewington Decl., Dkt. 109-24.)  Dr. Herrington is a primary care physician and

has worked as a correctional facility medical director. (Defs. 56.1 ¶ 61; Pl. 56.1 Opp. ¶ 61.)   After

reviewing Plaintiff's NUMC and Armor records, Herrington concluded that Defendants "failed to

provide continuity in managing [Plaintiff's] chronic pain, failed to send him for outside consultations

for pain management and failed to provide adequate pain medication." (Defs. 56.1 ¶ 61; Pl. 56.1 Opp.

¶ 61.)[11]  He further concluded that Defendants' pain management strategy for Plaintiff was "shockingly

short of reasonable expectation"; that Defendants should have had a chronic pain clinic, "failed to

carry out provider generated referrals," to ensure continuity of treatment, and to diligently continue

any pain medication already being prescribed to Plaintiff; and that Defendants' "negligent and

deliberately indifferent" treatment caused Plaintiff "undue and unnecessary additional pain and

suffering." (Herrington Report at 12–13; *see* Defs. 56.1 ¶ 62; Pl. 56.1 Opp. ¶ 62.)

On September 21, 2021, Dr. Herrington filed an addendum to his report, in which he found

that Plaintiff was incarcerated in a "disease amenable" environment and that Armor's practice was

"not only grossly negligent and a clear departure from good and acceptable correctional medical

practice but [was] furthermore deliberately indifferent to [Plaintiff's] serious medical needs."

("Herrington Addendum" at 5, Ex. I to Brewington Decl., Dkt. 109-27.)

Defendants' expert Dr. David Mathis, a family doctor and certified correctional healthcare

---

[11] Plaintiff "disputes" this statement but does not dispute that this was the conclusion that Herrington reached.  (*See* Pl. 56.1 Opp. ¶ 61.)

professional, produced a report finding that Ms. Brady would not have been qualified to discontinue Plaintiff's medication.  (Defs. 56.1 ¶ 64; Pl. 56.1 Opp. ¶ 64.)  Because Dr. Mathis found no evidence that she had discontinued Plaintiff's medication, he concluded that Ms. Brady had not violated any standard of care.  (Defs. 56.1 ¶ 64; Pl. 56.1 Opp. ¶ 64.)

With regard to the pain treatment provided to Plaintiff by Armor, Dr. Mathis opined that Plaintiff showed no objective need for pain medication in light of the results of his CT scan.  (Defs. 56.1 ¶ 65; Pl. 56.1 Opp. ¶ 65.)  He found that there was no need to send Plaintiff to an orthopedist because Plaintiff stated he did not need surgery for his neck and that there was no evidence that Plaintiff's daily activities were diminished as a result of his pain.  (Defs. 56.1 ¶ 65; Pl. 56.1 Opp. ¶ 65.)

## PROCEDURAL BACKGROUND

On February 2, 2015, Plaintiff, acting *pro se,* filed the Complaint asserting claims under 42 U.S.C. § 1983 against "Dr. Vincent Manetti of Armor Health, Nurse Brady of Armor Health, Sheriff Sposato of Nassau County Correctional Center and His Employees Janes and John Doe, etc. et al." (Compl. at 1, 3.)  Plaintiff handwrote and signed the Complaint (*id.* at 15), but he did not do so under penalty of perjury (*but see id.* at 5).

All defendants filed a Motion to Dismiss.  (Dkt. 14.)  On February 24, 2016, the Honorable Joseph F. Bianco denied the Motion to Dismiss as to Plaintiff's claims against Ms. Brady, Dr. Manetti,

and Armor,[12] and granted it as to all other defendants.[13]  *Donohue v. Manetti*, No. 15-CV-636 (JFB)(GRB), 2016 WL 740439 (E.D.N.Y. Feb. 24, 2016); (*see* "Order on Mot. to Dismiss," Dkt. 25). Plaintiff's motion to appoint counsel (Dkt. 48) was granted, and pro bono counsel appeared on behalf of Plaintiff on June 26, 2017 (Dkt. 49).  On November 13, 2018, Plaintiff informed the Court that he had retained counsel, who entered an appearance on December 20, 2018.  (Dkt. 56.)

On November 25, 2019, the parties stipulated to amend the case caption to its current form. (Dkt. 69.)  The parties have consented to magistrate judge jurisdiction.  (Dkt. 71.)

---

[12] Although the Complaint (which has never been amended) does not name Armor as a defendant in its caption, Judge Bianco noted that Plaintiff had "plausibly alleged that Armor had a custom or policy of denying inmates adequate medical care," *Donohue*, 2016 WL 740439, at *6, and concluded that the claims against Armor could proceed along with those against Manetti and Brady, *id.*

Federal Rule of Civil Procedure 10(a) mandates that the caption of a pleading contain the names of all parties. *Rapp v. Fowler*, 537 F. Supp. 3d 521, 526 (S.D.N.Y. 2021) ("'[T]hough seemingly pedestrian,' Rule 10(a) 'serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly.'" (quoting Fed. R. Civ. P. 10(a))).  However, "where a party has actual notice of a suit and is correctly identified in the body of the complaint, courts have typically held that an error in the caption is a technical defect."  *Nationwide Mut. Ins. Co. v. Kaufman*, 896 F. Supp. 104, 109 (E.D.N.Y. 1995).  Courts "should be guided by whether a reasonably knowledgeable layperson could conclude, from the circumstances, that he or she had been made a party to a lawsuit."  *Id.*

Here, the Complaint contained sufficient factual allegations against Armor such that it has defended itself in this action as if it had been formally named a defendant.  For example, on March 30, 2015, John J. Doody, Esq., entered an appearance on behalf of "Defendants Armor Correctional Health Services of New York, Inc. i/s/h/a 'Armor Correctional Health Services,' Dr. Vincent Manetti, by his employer Armor Correctional Health Services, [and] Nurse Jane Brady, by her employer Armor Correctional Health Services." (Notice of Appearance at 1, Dkt. 7.)  Defendants argued in their Motion to Dismiss that Plaintiff had failed to state a claim under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978) by failing to establish that Armor had a custom of providing insufficient medical care.  (Mot. To Dismiss at 8, Dkt. 16.)  At Plaintiff's deposition on August 12, 2019, Dale McLaren, Esq. introduced himself as counsel for Armor.  (Pl. Tr. 3:7-15.)  In the Motion, Defendants again argue against *Monell* liability.  Although Defendants claim that Judge Bianco "mistakenly" included Armor as a remaining defendant in the Order on the Motion to Dismiss (Def. Supp. Br. at 2 (Dkt. 119)), Defendants never requested a correction or reconsideration.

Accordingly, the Court considers the failure to include Armor as a defendant in the caption of this case to be a technical defect and respectfully direct the Clerk of Court to amend the caption now to name Armor as a defendant.

[13] Plaintiff was granted leave to amend the Complaint with regard to Sposato, John Doe and Jane Doe but failed to do so, and the claims against these defendants were dismissed on May 14, 2019.  (Dkt. 61.)

Defendants never filed an answer,[14] but the parties nevertheless conducted discovery, which was completed on February 22, 2022.  (*See* Feb. 17, 2021 Min. Entry; Dkt. 101.)

Defendants' Motion for Summary Judgment was fully briefed on August 6, 2022, seeking dismissal of Plaintiff's Section 1983 deliberate indifference claims against Dr. Manetti, Ms. Brady, and Armor.  Oral argument was held on March 1, 2023, after which the parties filed supplemental briefings at the Court's request.  A further oral argument was held on March 21, 2025, and Plaintiff was granted leave to supplement his briefings on the limited issue of Ms. Brady's alleged statements (Mar. 21, 2025 Min. Entry), which he did on March 27, 2025 (Pl. Ltr., Dkt. 130).

## DISCUSSION

Defendants contend that the claims should be dismissed because Plaintiff failed to exhaust administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA"), and because there is no genuine dispute as to any material fact on any of the claims.

I.    **Plaintiff's Failure to Exhaust Administrative Remedies**

Defendants argue that the case should be dismissed because Plaintiff failed to comply with the Prison Litigation Reform Act of 1995 ("PLRA"), which requires that an inmate exhaust all administrative remedies before filing an action regarding prison conditions under Section 1983 or any other federal law.  42 U.S.C. § 1997e(a).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  However, failure to exhaust is an affirmative defense.  *Id.* at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

---

[14] Plaintiff argues that by failing to file an answer, Defendants "essentially defaulted."  (Plaintiff's Memorandum of Law Opposing Summary Judgment ("Pl. Mem.") at 3, Dkt. 109-29.)  The Court rejects this argument, as Defendants have vigorously defended themselves notwithstanding this lacuna in their pleadings.

Federal Rule of Civil Procedure 8(c) requires that "[i]n responding to a pleading, a party must affirmatively state any . . . affirmative defense. . . ." "Ordinarily in civil litigation, [an affirmative defense] is forfeited if not raised in a defendant's answer or in an amendment thereto. An affirmative defense, once forfeited, is excluded from the case." *Wood v. Milyard*, 566 U.S. 463, 470 (2012) (citations omitted); *see also Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) ("Failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." (internal quotation omitted)). Such a rule "is intended to notify a party of the existence of certain issues," and "a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation." *Doubleday & Co. v. Curtis*, 763 F.2d 495, 503 (2d Cir. 1985).

The Second Circuit has held that the defense of failure to exhaust available administrative remedies is an affirmative defense that is waivable, specifically under the PLRA. *Johnson v. Testman*, 380 F.3d 691, 695 (2nd Cir. 2004). It is especially appropriate to consider the defense waived where the defendants had "information that was available to them prior to any discovery taking place" and failed to raise the issue earlier or represented that prison grievance procedures were not available. *Handberry v. Thompson*, 446 F.3d 335, 342 (2d Cir. 2006).

However, even "[i]f a defendant omits an affirmative defense from his answer or first responsive pleading, a district court may nevertheless decline to deem the defense waived if the plaintiff had notice and an opportunity to respond." *Arciello v. County of Nassau*, No. 16-CV-3974 (ADS)(SIL), 2019 WL 4575145, at *4 (E.D.N.Y. September 20, 2019). "[T]he law is clear that, in the absence of prejudice, a defendant may raise an affirmative defense in a motion for summary judgment for the first time." *Id.* (citation omitted); *see also Astor Holdings, Inc. v. Roski*, 325 F. Supp. 2d 251, 260 (S.D.N.Y. 2003) (the Court may consider the merits of an affirmative defense "raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond" (citing *Curry v. City of Syracuse,* 316 F.3d 324, 330-31 (2d Cir. 2003))); *Wilkins v. Specialized Loan Servicing, LLC,*

16

No. 20-CV-543, 2022 WL 3593154, at *1-2 (S.D.N.Y. August 23, 2022) (same). Waiver of an affirmative defense "may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party." *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897, 910 (2d Cir. 1998).

Because permitting a defendant to raise an affirmative defense for the first time in a summary judgment motion is tantamount to granting it leave to amend its answer, courts also consider factors underlying a request for leave to amend an answer under Federal Rule of Civil Procedure 15. *See S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 213 (E.D.N.Y. 2007) (citing *Block v. First Blood Assocs.,* 988 F.2d 344, 349–351 (2d Cir. 1993)[15]). Applying the factors for whether to permit amendment of an answer, a district court has discretion to deny a defendant leave to amend its answer "'where the motion is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant.'" *Levy v. Kosher Overseers Assn. of Am., Inc.*, No. 92-CV-8377 (DLC), 2000 WL 294842, at *6 (S.D.N.Y. Mar. 21, 2000) (quoting *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 157 F.3d 956, 962 (2d Cir. 1998)).

Defendants never filed an answer to the Complaint and, thus, did not raise any affirmative defenses, including the argument raised here that Plaintiff failed to exhaust his administrative remedies under the PLRA. They also did not raise this issue as a basis for dismissing the Complaint when they filed their Motion to Dismiss on May 14, 2015. Copies of the grievances submitted by Plaintiff on November 30, 2014 and December 17, 2014 were attached to the Complaint. From these documents and their own records, Defendants could have ascertained, without the need for discovery, whether

---

[15] In *Block*, the defendants raised the affirmative defense of statute of limitations for the first time on summary judgment. 988 F.2d at 350. Although they had not moved to amend their answer to include the statute of limitations as an affirmative defense, the district court construed their summary judgment motion also as a motion to amend their answer and applied the analysis under Rule 15(a). The Second Circuit affirmed the district court's decision to grant defendants leave to amend their answer on the basis that the plaintiff did not demonstrate bad faith or prejudice. *Id.* at 350–51.

Plaintiff had exhausted his administrative remedies.

By not pointing out Plaintiff's procedural defect until more than seven and one-half years after the Complaint was filed and after discovery has been completed, Defendants have failed to raise at the "first pragmatically possible time" the issue of Plaintiff's failure to exhaust administrative remedies. *Arciello*, 2019 WL 4575145, at *5.

Plaintiff was released from NCCC on June 18, 2015 and from custody on February 27, 2019. (Pl. Tr. 7:2–9; 28:3–4.)  Had Defendants raised the affirmative defense of Plaintiff's failure to exhaust administrative remedies earlier, he may have had the opportunity to remedy it and possibly refile his claim.  Because the three-year statute of limitations for Plaintiff's Section 1983 claims has long passed, *see, e.g.*, *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) ("New York's three-year statute of limitations . . . governs Section 1983 actions in New York. . . "), the excessive delay has prejudiced Plaintiff.

Defendants offer no satisfactory explanation for their delay in raising this defense, stating only that Judge Bianco granted Plaintiff leave to file an amended complaint within thirty days and that Plaintiff failed to do so.  (Def. Mem. at 3.)  Plaintiff's failure to file an amended complaint against defendants Sposato, John Doe and Jane Doe does not excuse Defendants' failure to file an answer to the remaining claims in the Complaint, nor does it explain why Defendants did not raise this affirmative defense in their motion to dismiss or any subsequent proceedings in the intervening seven years.

Accordingly, I find that Defendants have waived their ability to raise for the first time in the Motion the affirmative defense of failure to exhaust administrative remedies.  *See Learning Care Group, Inc. v. Armetta*, 13-CV-1540 (VAB), 2016 WL 3248178, at *8 (D. Conn. June 12, 2016) (finding that defendants waived their affirmative defenses by failing to file an answer and failing to raise them in

their motion to dismiss).[16]

## II.    Summary Judgment as to Deliberate Indifference

### A.  Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Rule 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—
> or the part of each claim or defense—on which summary judgment is sought.
> The court shall grant summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is entitled to judgment
> as a matter of law.

Fed. R. Civ. P. 56(a).  "In ruling on a summary judgment motion, the district court must 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment' and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citation omitted) (quoting *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).  A "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

Allegations in a complaint that are contradicted by a later deposition cannot create a triable issue of fact. *See, e.g.*, *Taylor v. Ridley*, 904 F. Supp. 2d 222, 232 (E.D.N.Y. 2012) (collecting cases and granting summary judgment where allegations in complaint were "unexpectedly inconsistent and

---

[16] Defendants request, in the alternative, leave to file an answer now.  (Defendants' Reply in Support of Motion for Summary Judgment at 4–5, Dkt. 121.)  For the reasons stated above applicable to consideration of a motion to amend, the Court denies Defendants' request.

contradictory with his testimony . . . at his deposition . . . and are uncorroborated by any independent evidence in the record."); *AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 (S.D.N.Y. 2005) ("[J]ust as the court should not accept an affidavit that contradicts deposition testimony, it should also not allow inconsistent allegations made in a complaint to defeat summary judgment in the face of contradictory testimony either.").

"It is the movant's burden to show that no genuine factual dispute exists. . . ." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). Once the movant satisfies its burden, the party opposing summary judgment "must point to specific evidence in the record" demonstrating a genuine issue for trial and "cannot rest on allegations in the pleadings." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)), *abrogated in part on other grounds by Kravitz v. Purcell*, 87 F.4th 111, 119, 122 (2d Cir. 2023). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## B. *Section 1983 Legal Standard – Deliberate Indifference*

"Section 1983 does not itself create substantive rights; rather, it offers 'a method for vindicating federal rights elsewhere conferred.'" *Donohue*, 2016 WL 740439, at *3 (quoting *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)). "To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law." *Id.* (quoting 42 U.S.C. § 1983).

Plaintiff brings claims under 42 U.S.C. § 1983 for violations of his rights under the Eighth and Fourteenth Amendments. "The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Donohue*, 2016 WL 740439, at * 6 (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citations omitted)). "Because Plaintiff was a pre-trial detainee, the

Fourteenth Amendment supplies the relevant legal standard," which applies to Plaintiff's deliberate indifference claims. *Yancey v. Robertson*, 828 F. App'x 801, 803 (2d Cir. 2020) (summary order) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)).

In order to succeed on a claim of deliberate indifference to serious medical needs, a plaintiff must establish both an objective prong and a *mens rea* prong.[17] *Darnell*, 849 F.3d at 29; *see Donohue*, 2016 WL 740439, at *6.

### 1. **Objective Component**

"For both the Eighth and Fourteenth Amendments, the objective prong poses the same standard," *Horace v. Gibbs*, 802 F. App'x 11, 14 (2d Cir. 2020) (summary order) (citing *Darnell*, 849 F.3d at 32), requiring that "the alleged deprivation of adequate medical care . . . be 'sufficiently serious.'" *Salahuddin*, 467 F.3d at 279 (internal quotation omitted). To establish this component, "the inmate [must] show that he was actually deprived of adequate medical care by an official's failure to take reasonable measures in response to a sufficiently serious medical condition." *Thomas v. Wolf*, 832 F. App'x 90, 92 (2d Cir. 2020) (summary order) (cleaned up).

There are two inquiries within this analysis. The first is "whether the prisoner was actually deprived of adequate medical care." *Donohue*, 2016 WL 740439, at *6 (quoting *Salahuddin*, 467 F.3d at 279–80). "As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Salahuddin*, 467 F.3d at 279. The second is "whether the inadequacy in medical care is sufficiently serious . . . [which] requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 279–80.

"[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* at 280.

---

[17] Although "[c]ourts have traditionally referred to this second element as the 'subjective prong,'" as discussed below, it "might better be described as the '*mens rea* prong' or 'mental element prong.'" *Darnell*, 849 F.3d at 32.

Factors to consider when evaluating the seriousness of an inmate's medical condition include, but are not limited to, "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Donohue*, 2016 WL 740439, at *6 (quoting *Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (citation omitted)).

If "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

"For a constitutional violation to occur based on deliberate indifference to a prisoner's medical need, the deprivation of medical care must be 'sufficiently serious' in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Yancey*, 828 F. App'x at 803 (cleaned up and quotation omitted).

### 2. ***Mens Rea* Component**

The *mens rea* prong requires that the defendant acted with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Darnell*, 849 F.3d at 36; *see, e.g.*, *Adamson v. Miller*, 808 F. App'x 14, 18 (2d Cir. 2020) (summary order); *Dumel v. Westchester Cnty.*, 656 F. Supp. 3d 454, 465 (S.D.N.Y. 2023). The plaintiff must demonstrate that "the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to [the detainee's] health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (emphasis

in original) (quoting *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019)); *see also Horace*, 802 F. App'x at 14; *Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) (summary order).

"Courts must be careful," however, "to not consider departure from the accepted standard of medical care," or medical malpractice, "as serious indifference." *Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 657 (E.D.N.Y. 2021). "'[M]ere disagreement over the proper treatment does not create a constitutional claim,' and accordingly, '[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Donohue*, 2016 WL 740439, at *7 (alteration in original) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)); *see also Laurent v. Edwin*, 528 F. Supp. 3d 69, 87 (E.D.N.Y. 2021). Nonetheless, "judgments that have no sound medical basis, contravene professional norms, and appear designed simply to justify an easier course of treatment . . . may provide the basis of a claim." *Ryan v. Cnty. of Nassau*, No. 12-CV-5343 (JS)(SIL), 2016 WL 11500151, at *7 (E.D.N.Y. Mar. 31, 2016) (alteration in original and citation omitted); *see also Laurent*, 528 F. Supp. 3d at 87 ("In certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan, as evident when treatment recommendations are not derived from sound medical judgment, but ulterior motives." (cleaned up and citation omitted)).

To establish individual liability under Section 1983, a plaintiff must also "establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity under § 1983." *Patterson*, 375 F.3d at 229.

### C. Defendant Manetti

Plaintiff argues that Dr. Manetti's failure to provide him with any mental health medication—despite Plaintiff's history of anxiety, depression, and panic attacks and a 20-year history of taking mental health medication—along with his failure to verify the medications that he had been taking,

constitutes deliberate indifference in violation of his Eighth and Fourteenth Amendment rights.  (*See* Pl. Mem. at 9–19.)

Dr. Manetti's personal involvement in the alleged violations is not disputed.  Rather, Defendants argue that Plaintiff fails to present evidence in support of his allegations of deliberate indifference or inadequate medical treatment.  (Def. Mem. at 2.)

### 1.  **Objective Component**

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need."  *Hamm v. Hatcher*, No. 05-CV-0503 (ER), 2013 WL 71770, at *8 (S.D.N.Y. Jan. 7, 2013) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)).  Plaintiff reports having severe anxiety, depression, and panic attacks and having been prescribed medication to treat those conditions for twenty years.  In addition to Plaintiff's testimony, Plaintiff's NUMC medical records, Armor Health Assessment, and Armor Mental Health Screening reveal that he reported a history of these ailments when he was taken into custody.

Dr. Marcos was also able to confirm that Plaintiff was previously taking nortriptyline before being incarcerated at NCCC.  "[T]he fact that [the plaintiff] was previously treated for a psychiatric condition with medication would clearly indicate that his condition was serious."  *Colon*, 2014 WL 4904692, at *7; *see, e.g., Jones v. Rock*, No. 12-CV-447 (NAM)(TWD), 2013 WL 4804500, at *15 (N.D.N.Y. Sept. 6, 2013) (finding that plaintiff's allegations of mood disorder for which he had taken medication and that he had attempted suicide plausibly established that his mental health problems were "serious").  Plaintiff's history of mental health conditions, combined with his suicidal ideations and attempted suicide while at NCCC, indicate that his mental health needs were sufficiently serious. *See, e.g., Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) ("[C]ase law within this Circuit recognizes that 'depression combined with severe anxiety attacks or suicide attempts is a serious

medical need' in the context of deliberate indifference." (quoting *Zimmerman v. Burge*, No. 06-CV-0176 (GLS)(GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009))).

There is also evidence that Plaintiff's anxiety and depression affected his daily life.  Plaintiff asserts that he experienced panic attacks, could not eat or sleep, and felt anxious and depressed.  (*See, e.g.*, Pl. 56.1 Opp. ¶ 64 (citing Mendelsohn Report).)  His conditions and complaints are documented in many of the mental health rounds notes.  (*See generally* Exs. C-1 through C-4 to Brewington Decl., Dkts. 108-3 through 6.)  Plaintiff also states that he attempted suicide in December 2014.  (*See* Pl. 56.1 Opp. ¶ 64 (citing Mendelsohn Report).)

Whether Dr. Manetti acted reasonably in choosing not to provide Plaintiff with medication for his depression and anxiety "is a more difficult question, which cannot be resolved as a matter of law."  *See Ryan*, 2016 WL 11500151, at *6.  The parties have submitted conflicting expert reports.  Dr. Mendelsohn concluded that Dr. Manetti "deviated from standard, customary, and ordinary care" in discontinuing his psychiatric medication given that Plaintiff had an active prescription for the medication when he arrived at NCCC and exhibited signs of depression and anxiety throughout his incarceration.  (Mendelsohn Report at 11–12.)  Additionally, Dr. Mendelsohn found that because nortriptyline, which Plaintiff was briefly given by Dr. Marcos, is not a controlled substance, Dr. Manetti's alleged concern about Plaintiff's substance dependence would not have precluded him from prescribing it.  (*Id.* at 12.)  Finally, he stated that Dr. Manetti did not conduct the necessary diagnostic tests to support his conclusion that Plaintiff might be malingering.  (*Id.* at 11.)

From Dr. Mendelsohn's findings, a reasonable juror could find that the lack of treatment Plaintiff experienced was "sufficiently serious."  *See, e.g.*, *Ryan*, 2016 WL 11500151, at *6 (finding expert opinion that psychiatrist breached standard of care by delaying plaintiff's psychological evaluation, discontinuing his psychotropic medication, and failing to keep him under constant supervision created

factual questions as to whether psychiatrist had acted reasonably that could not be resolved on summary judgment).

### 2. *Mens Rea* Component

There are also genuine disputes of material fact as to whether Dr. Manetti had a sufficiently culpable state of mind when he failed to prescribe Plaintiff mental health medication.

Dr. Manetti testified that he could not recall whether Plaintiff informed him of his history of anxiety, depression, and panic attacks. He testified that the record he reviewed before meeting with Plaintiff "indicated that he was not on medications prior to coming to the jail." (Manetti Tr. 58:22–59:17; 60:3–16.)

Plaintiff is not required to establish that Dr. Manetti actually knew that without medication, Plaintiff was at risk of serious medical conditions; it is enough that Dr. Manetti should have known that failing to provide him with medication would pose a substantial risk to his health. *See, e.g.*, *Darby*, 14 F.4th at 128.

The evidence in the record is such that a reasonable juror could find that Dr. Manetti either knew or should have known that Plaintiff was at risk of serious harm without medication to treat his psychological conditions. While the Sheriff's Department "New Admission Physical Condition Report" completed on September 19, 2014 states that Plaintiff did not have any illnesses and was not currently taking any medication, the NUMC records, Armor Health Assessment, and Armor Mental Health Screening records indicate that Plaintiff reported a history of anxiety and depression. Some of these records also reveal that Plaintiff had been hospitalized twice for anxiety and depression and that he had previously taken Klonopin and nortriptyline. (*See* Ex. C to Brewington Decl. at 8.) NCCC officials also made the decision to admit Plaintiff to the medical floor where he was placed in a psychiatric cell. (Defs. 56.1 ¶ 10; Pl. 56.1 Opp. ¶ 10.)

A jury could find that Dr. Manetti either reviewed, or should have reviewed, these records and

was thus aware of Plaintiff's mental health conditions and medication history. Moreover, Dr. Manetti was aware that Plaintiff was experiencing suicidal thoughts at least at the time of their first meeting, where he recommended that Plaintiff continue to be placed under constant supervision. Plaintiff's "Mental Health Rounds Progress Note" from the same day states that Plaintiff felt very depressed. (Ex. C-1 to Brewington Decl. at 13.) Additionally, daily mental health rounds notes indicate that Plaintiff repeatedly informed social workers that he was depressed, anxious, and wanted to speak with Dr. Manetti. (*See* Mendelsohn Report at 6–8.)

There is also a genuine dispute as to the reason Dr. Manetti chose not to prescribe Plaintiff medication. Plaintiff's treatment records show that at the time of his evaluation, Dr. Manetti wrote down that Plaintiff had demanded benzodiazepines "because [he was] in jail," and Dr. Manetti believed that Plaintiff might be malingering. (*See* Defs. 56.1 ¶¶ 40–45.) Dr. Manetti also testified that he did not believe that prescribing controlled substances to someone with a history of substance dependence was medically advisable. (Manetti Tr. 56:2–5, 71:7–12.) Finally, Dr. Manetti stated that he wanted to confirm Plaintiff's prior prescriptions, if any, before prescribing medication to Plaintiff. (*Id.* 147:21–148:12.)

Plaintiff asserts that Dr. Manetti stated that he was not prescribing medication to Plaintiff because it was Armor's policy not to provide pills to inmates.

Although Plaintiff's sworn deposition testimony is the only evidence of Dr. Manetti's statement regarding an Armor policy, "[a] single witness's sworn testimony, if believed by a jury, can support a verdict, and is enough to raise a genuine issue of fact precluding summary judgment." *Bradshaw v. City of N.Y.*, 855 F. App'x 6, 9 (2d Cir. 2021) (summary order); *see also Young*, 15 F. Supp. 3d at 185 (collecting cases and finding that plaintiff's sworn complaint and deposition testimony constituted evidence sufficient to consider for summary judgment purposes). There is no documentary evidence that directly contradicts Plaintiff's testimony, and it is not for the Court to

determine whether Plaintiff's account is credible.  *See, e.g., Scott v. Coughlin*, 344 F.3d 282, 289–90 (2d Cir. 2003) ("By finding against [plaintiff] on the basis of the disparity between some of [plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof.  The credibility of [plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact."); *but see, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (ruling against plaintiff whose excessive force case relied "almost exclusively on his own testimony, much of which is contradictory and incomplete" and noting that "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. . . . [Non-moving parties] may not rely on conclusory allegations or unsubstantiated speculation. . . . At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." (cleaned up and internal quotations omitted)).

If a jury finds credible Plaintiff's testimony that Dr. Manetti chose not to prescribe Plaintiff medication because of his reliance on a purported Armor policy, a jury could find that that he acted with deliberate indifference.  *See, e.g., Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (finding that whether defendants acted with deliberate indifference to plaintiff's medical needs by refusing to prescribe him Hepatitis C medication due to a Department of Corrections policy was a question of fact to be determined by the jury); *Colon*, 2014 WL 4904692, at *7 (finding that denial of psychiatric medication based on Armor's budget rather than medical need could establish *mens rea* prong of deliberate indifference claim); *Ryan*, 2016 WL 11500151, at *7.

Additionally, whether Dr. Manetti acted recklessly by failing to make additional efforts to obtain Plaintiff's prior treatment records is at issue.  In his expert report, Dr. Mendelsohn stated that "[t]he standard of care would have been to gather as much information as possible on the psychiatric care and treatment rendered to [Plaintiff] prior to his arrival at Nassau County," and that "Dr. Manetti

28

should have made an earnest effort to obtain past metal health records from Fishkill knowing [Plaintiff] gave him a history that he had prior psychiatric treatment and had been placed on medication." (Mendelsohn Report at 11.)

Given that, according to Plaintiff, Dr. Manetti failed make any such effort, a jury could find that he acted with deliberate indifference to Plaintiff's serious medical needs. *See, e.g.*, *Wright*, 412 F.3d at 404 (finding that a jury could find that defendants knew and disregarded an excessive risk to plaintiff's health based on evidence that included, *inter alia*, defendants' failure to take "any step whatsoever to investigate—let alone verify—whether it would be medically appropriate" to decline to prescribe plaintiff medication despite his treating physicians' advice to the contrary).

Finally, the fact that Dr. Marcos prescribed Plaintiff nortriptyline at NCCC despite his history of substance dependance could lead a reasonable jury to conclude that Dr. Manetti's rationale for not prescribing the medication was pretextual. *Id.* at 405–06 (finding the fact that plaintiff's physicians recommended that he be given medication despite concerns about his compliance undercut defendants' argument that they were justified in not giving plaintiff the medication due to compliance concerns); *but see, e.g.*, *Laurent*, 528 F. Supp. 3d at 88 (collecting cases establishing that deliberate indifference is not met simply because one doctor's treatment plan for an inmate differs from that of another doctor).

There are genuine disputes of material fact as to whether Dr. Manetti was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, summary judgment on Plaintiff's claims against Dr. Manetti is denied.

### D. Defendant Brady

Plaintiff asserts that Ms. Brady unilaterally discontinued his Ultram pain medication and gave him an NSAID, which Ms. Brady knew or should have known he was allergic to. Plaintiff also alleges

that Ms. Brady told him "I was hoping you would have died" when he reported that he had an allergic reaction to medication that she had administered to him.

Plaintiff argues that Ms. Brady's unilateral discontinuation of his Ultram prescription on December 17, 2014 and provision of an NSAID, to which he is allergic, violate his Eighth and Fourteenth Amendment rights.

Defendants contend that Ms. Brady did not have the authority to order or discontinue Plaintiff's medication, and, therefore, cannot be held liable for deliberate indifference under § 1983. (Def. Mem. at 21–22.)

### 1. __Discontinuation of Ultram__

Plaintiff contends that Ms. Brady deprived him of adequate medical care by discontinuing Ultram, which, to establish deliberate indifference, must be sufficiently serious and caused by an official's failure to take reasonable measures in response to a medical condition. *Salahuddin*, 467 F.3d at 279; *Thomas*, 832 F. App'x at 92. Here, "'sufficiently serious' means a condition of urgency exists that may produce death, degeneration, or extreme pain." *Yancey*, 828 F. App'x at 803 (quotation omitted).

Plaintiff's Ultram prescription was discontinued on December 17, 2014 and reinstated on December 30, 2014. (*See* Herrington Report at 4; Brady Tr. 93:20–94:11; Ex. C-1 to Brewington Decl. at 2; Ex. C-5 to Brewington Decl. at 29.) During the time that Plaintiff was without Ultram, he made four sick call requests. Plaintiff wrote on December 18, 2014, "I am in constant extreme pain!"; on December 19, he wrote, "I am in extreme pain!"; on December 25, he wrote, "I am in constant extreme pain!"; and on December 29, he wrote, "severe pain I am in every day!" (Ex. J-1 at 21–24.)

Given that Plaintiff alleges a disruption in treatment rather than a total denial of pain medication, the medical consequences of the disruption must be considered. *See, e.g.*, *Davis v. McCready*, 283 F. Supp. 3d 108, 120 (S.D.N.Y. 2017) ("In evaluating whether a delay in treatment is sufficiently

serious, 'the actual medical consequences that flow from the alleged denial of care will be highly relevant.'" (quoting *Carpenter*, 316 F.3d at 187)); *Snyder v. Alam*, No. 15-CV-4033 (VB), 2016 WL 2642226, at *4 (S.D.N.Y. May 6, 2016) (considering only injuries that were a result of delay in medical treatment where plaintiff claimed that the delay constituted deliberate indifference to his serious medical needs).

Plaintiff does not allege that his condition worsened either temporarily or permanently due to Ultram being discontinued.  His complaints of serious pain were fairly consistent before, during, and after the period between December 17, 2014 and December 30, 2014 when Ultram was discontinued. (*See supra* n. 10 (listing Plaintiff's complaints of pain between September 2014 and March 2015).) Indeed, Plaintiff complained of similarly severe pain for months beforehand and even up to just five days before Ultram was discontinued.  Plaintiff has not shown how any pain he experienced was caused by being deprived of Ultram.

"As a threshold matter, the mere fact that plaintiff's underlying [condition] is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk."  *Price v. Reilly*, 697 F. Supp. 2d 344, 359 (E.D.N.Y. 2010).  Plaintiff has failed to produce any evidence that ceasing Ultram caused or will cause him any objective harm.  *See id.* (finding that a plaintiff's medication dosage claim failed because the plaintiff only alleged that an allegedly incorrect dosage was "wrong" and was "hurting" him).  Taking Plaintiff's assertions as true, Plaintiff suffered from severe pain, but there is no indication that his symptoms worsened to any cognizable degree after December 17, 2014, when Ultram was discontinued.  *See, e.g.*, *Jones v. Sheriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 658 (E.D.N.Y. 2021) (finding that brief delay in administration of pain medication that "caused plaintiff some degree of pain or discomfort" would "not [be] constitutionally deficient where plaintiff suffered neither death nor degeneration of his condition").  Therefore, there is no

evidence that the denial of Ultram from December 17 to 30, 2014 significantly impacted Plaintiff's pain such that a reasonable jury could find that his condition was sufficiently serious.

Moreover, Ms. Brady's duty in this context is to provide reasonable care. *Salahuddin*, 467 F.3d at 279. While Plaintiff's expert has opined that Defendants generally failed to ensure Plaintiff's continuity of treatment (Herrington Report at 14), it is not clear that Ms. Brady's purported act of discontinuing Plaintiff's Ultram was unreasonable *per se*, nor is it clear why Ms. Brady should be held individually liable for this alleged general failure in continuity. Plaintiff's Ultram was discontinued or reduced on other occasions as well, including on various dates in November 2014, from February 1 to February 5, 2015, and from March 23, 2015 to April 10, 2015. (Herrington Report at 4–5, 7–8; Ex. C-4 to Brewington Decl. at 3; Pl. 56.1 ¶ 44.) Plaintiff does not allege that he experienced any significant, unusual pain or medical setbacks on those occasions. Plaintiff also does not elucidate why adjusting his dosage of Ultram or eliminating it was unreasonable.

The parties dispute whether Ms. Brady could have discontinued Ultram unilaterally, because, as an LPN, she was not authorized to do so. (*See* Brady Tr. 169:18–170:24.) But ultimately, that issue is not relevant.

Because Plaintiff has not demonstrated that the discontinuance of Ultram constituted a sufficiently serious deprivation of medical care, summary judgment is granted as to Plaintiff's claim against Ms. Brady related to her denial of medication.

### 2. **Provision of NSAIDs**

#### a. *Objective Component*

Plaintiff contends that Ms. Brady acted with deliberate indifference to his serious medical needs by giving him an NSAID, which caused him to suffer a severe allergic reaction. (Pl. Mem. at 10–12.) Plaintiff testified that, after taking the ibuprofen that Ms. Brady had administered to him, his

heart began racing, his throat closed such that he could not breathe, and he passed out.  (Pl. Tr. 95:3–7.)  The allergic reaction is not documented in Plaintiff's medical records.

Giving Plaintiff an NSAID despite his medical record reflecting that he was allergic to NSAIDs could constitute a deprivation of adequate medical care, but Plaintiff must still demonstrate that the deprivation was sufficiently serious.

In *Yancey v. Robertson*, the Second Circuit, in affirming summary judgment entered against plaintiff, found that the plaintiff had not "met his burden to show that his [allergic reaction] was serious enough such that the delay in treatment here posed an unreasonable risk of severe damage to his health."  828 F. App'x at 803–04.  While the court "presumed" that, for purposes of the summary judgment motion, the plaintiff "indeed suffered from an allergic reaction to cause him some level of respiratory distress," *id.* at 804, this reaction on its own this did not meet plaintiff's burden.

Unlike the plaintiff in *Yancey*, Plaintiff did not seek out medical care for his allergic reaction while he was experiencing the reaction or afterwards.  Plaintiff also does not claim that his daily activities were significantly affected by the reaction, that he was in chronic or substantial pain, that he suffered any long-term effects from the NSAIDs, or that the symptoms were so acute that he sought out immediate medical attention.  Plaintiff's testimony indicates that his symptoms subsided by the following day.  (*See* Pl. Tr. 95:3–25.)

Plaintiff does, however, claim that he "fainted out" and lost track of events for some time, which is more severe than the allergic reaction the plaintiff in *Yancey* suffered.  828 F. App'x at 804.  Despite Plaintiff's failure to provide other evidence of the incident,[18] based on Plaintiff's testimony, a

---

[18] Courts have found that the lack of corroborating evidence can be insufficient to grant summary judgment.  *See, e.g.*, *Bradshaw*, 855 F. App'x at 9 ("A single witness's sworn testimony, if believed by a jury, can support a verdict, and is enough to raise a genuine issue of fact precluding summary judgment."); *Coughlin*, 344 F.3d at 289–90 ("By finding against [plaintiff] on the basis of the disparity between some of [plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof.  The credibility of [plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact.").

jury could reasonably conclude that his allergic reaction was sufficiently serious to create a condition of urgency that might produce death, degeneration, or extreme pain.

### b. Mens Rea *Component*

Plaintiff fails, however, to identify sufficient support in the record to establish that Ms. Brady possessed the requisite *mens rea*. He alleges in the Complaint that Ms. Brady told him she wished he "would have died." (Compl. ¶ 33.) But on a motion for summary judgment, the Court is not required to consider the allegations of an unverified complaint that are not supported by other evidence in the record. *See Taylor*, 904 F. Supp. at 232.

Plaintiff's sworn testimony at his deposition shows that when he confronted Ms. Brady the day after his allergic reaction, demanding to know what medication she had administered to him, she told him that it was ibuprofen, and when he informed her that he was allergic to NSAIDs, Ms. Brady said, "Oh, oh," and left. (Pl. Tr. 95:19–22.) This description of Ms. Brady's reaction is insufficient to establish that she acted recklessly or intentionally in giving him an NSAID. Plaintiff has thus failed to establish that Ms. Brady had the requisite *mens rea* for his claim of deliberate indifference.

Accordingly, the Court grants summary judgment as to Plaintiff's claims relating to allegations that Ms. Brady improperly administered medication to which she knew or should have known he was allergic.

### E. *Monell* Liability

Plaintiff argues that Armor is liable under Section 1983. Because Plaintiff has set forth sufficient evidence to create a genuine dispute of material fact, summary judgment is denied as to this claim.

A municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694–95. "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal

government and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Gleeson v. Cnty. of Nassau*, No. 15-CV-6487 (AMD)(RL), 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (quoting *Dilworth v. Goldberg*, No. 10-CV-2224 (RJH)(GWG), 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011)).

A plaintiff can prove the existence of a policy or custom by establishing "(1) a formal policy; (2) action taken or decisions made by policymakers that caused the violation; (3) a practice so persistent and widespread that it constitutes a 'custom or usage;' or (4) a failure to properly train or supervise [entity] employees." *Gleeson*, 2019 WL 4754326, at *14 (citing *Bvalets v. New York City Hous. Auth.*, No. 16-CV-6785 (CBA), 2017 WL 7793638, at *14 (E.D.N.Y. July 28, 2017)).

Plaintiff argues that Defendant Armor has a widespread and well-settled custom of providing inadequate medical care to inmates. "Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983." *Ryan*, 2016 WL 11500151, at *7 (internal quotation omitted). In support of his claim, Plaintiff points to various New York State Commission of Correction ("NYS COC") reports that document the conditions surrounding the deaths of numerous inmates under Armor's care between 2012 and 2016. (*See generally* "NYS COC Reports," Ex. H to Brewington Decl., Dkt. 109-24.)

Courts in this District have construed "widespread" to mean that "the unconstitutional acts in question are common or prevalent throughout the entity," and "well-settled" to mean that "the unconstitutional acts have achieved permanent, or close to permanent, status." *Gazzola v. Cnty. of Nassau*, No. 16-CV-0909 (JS)(AYS), 2022 WL 2274710, at *12 (E.D.N.Y. June 23, 2022) (internal quotation omitted). "While there is no magic number of instances of unconstitutional conduct that will suffice to permit the inference of a broader municipal policy or custom," *id.* (internal quotation omitted), where a plaintiff supports his claim with government reports "like the NYS COC," the Court

must ensure that "those reports are sufficiently connected to the specific facts of the case." *Isaac v. City of New York*, No. 16-CV-4729 (KAM), 2018 WL 5020173, at \*17 (E.D.N.Y. Aug. 6, 2018) (quoting *Gomez v. City of New York*, No. 16-CV-1274 (NGG)(LB), 2017 WL 1034690, at \*11 (E.D.N.Y. Mar. 16, 2017)), *R&R adopted*, 2018 WL 4583481 (E.D.N.Y. Sept. 24, 2018).

The NYS COC reports detail Armor's repeated failures to deliver adequate medical care to inmates at NCCC during the time period when Plaintiff alleges he was subjected to deliberate indifference to his serious medical conditions. The reports specifically call attention to "Armor's pattern of failing to properly manage patients['] chronic medical needs." (NYS COC Reports at 22, 30, 41.) As this Court has repeatedly found, such evidence sufficiently raises a genuine issue of material fact as to the existence of a custom of denying inmates adequate medical care. *See, e.g., Gazzola*, 2022 WL 2274710, at \*12 (finding a genuine dispute as to whether Armor had a custom of providing inadequate medical care where the plaintiff provided NYS COC reports about instances similar to plaintiff's allegations during a similar time period); *Gleeson*, 2019 WL 4754326, at \*16 (same). Accordingly, summary judgment as to Plaintiff's *Monell* claim is denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted as to the claims against Denise Brady and denied as to the claims against Dr. Vincent Manetti and Armor Correctional Health Services.

**SO ORDERED:**

*Peggy Kuo*
PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          March 31, 2025